SNEED, J.,
delivered tbe opinion of the Court.
The complainant, Martha "Wynne, is the widow of Thomas R. Wrynne, deceased, who departed this life in Lincoln county, in June, 1856, leaving a last will and testament, of which complainant, Willis Gr. Rives, is the surviving executor; and leaving two children, the defendants, Harriet and Catharine, who, with their mother, Martha, are the only legatees of said last will and testament. In the will there was a bequest of a slave named Jim, to complainant, Martha, for life, with remainder to defendants, Harriet and Catharine. ' The complainants filed their bill, making the said Harriet and Catharine, with their regular guardian, John B. Warren, defendants, and representing that it would be to the manifest advantage of both the life estate and the estate in remainder, that said slave, Jim, should be sold, and the proceeds invested in a young negro woman, and praying for such sale and investment, or for the exchange of said negro, Jim, for a negro woman, or woman and child, as might be deemed most proper and expedient. Upon a reference to the Clerk and Master to take proof upon the subject, that officer reported favorably, and recommended the appointment of a Commissioner to carry out the object of the complainant. The defendants, William B. Beattie and Daniel J. "Whit1 tington, were, by the decree of the Court, appointed Commissioners to effect said sale or exchange at ■ the Feb *120 ruary Term, 1859, of said Court, and accepted said trust. That part of the decree which imposes said trust is in the following words: “It is, therefore, ordered, adjudged and decreed by the Court, that William B. Beattie and Daniel J. Whittington be appointed Commissioners, who shall be and are hereby empowered to exchange or swap said boy, Jim, for a young negro woman or young woman and child; and upon such a swap or exchange, said Beattie and Whittington are authorized to execute a bill of sale, as Commissioners, for said boy, Jim; and in consideration thereof, they are further authorized to take title to such negro woman or woman and child, to the said Martha Wynne, for and during her natural life, with remainder in such slave or slaves to the infants, Harriet W. and Catharine V. Wynne. The said Commissioners, before such exchange, will carefully investigate the title to any such slave or slaves as they may pro-jjose to receive in exchange for said boy, Jim; or if the aforesaid Commissioners, to effect the end desired, should deem it best to sell said slave, then they are empowered so to do for cash, or on any time not exceeding ten months, either at private or public sale, taking and giving bills of sale, as hereinbefore directed; and if sold, the said Commissioners shall retain a lien on said boy until the purchase money is paid; on all of which matters said Commissioners shall make due report at the next term of this court.”
At the February Term, 1860, the defendants reported that they had found it impracticable to exchange said negro boy, Jim, for a woman or woman and child, and that they had sold the negro boy for one thousand dol *121 lars, his full value, and taken the purchaser’s note with good and sufficient security, due the 25th December, 1859, and that they had not been able to invest the fund in a negro woman, as contemplated when they were appointed Commissioners for that purpose. At the same term, the order for said investment was by the Court renewed. At the August Term, 1860, the Commissioners made further report that the purchase money for said slave had not yet been paid; and thereupon judgment was rendered against the purchaser for the sum due, amounting to $1,041.35, and execution awarded. From the said August Term, 1860, to the February Term, 1866, no further steps seem to have been taken in the cause. At the latter term, the Commissioners were ordered to make their report if practicable; and if not practicable they were allowed until the term following, at which term, August, 1866, they reported the payment of the purchase money and interest, $1,126.15, on the 10th of January, 1861, to R. A. McDonald, acting Clerk and Master; that they had found it impossible to purchase such a woman as the complainant wished for said sum of money, after repeated efforts; that they had arranged it with the complainant and with the guardian of the children to increase the fund by contribution of one-third from the complainant and two-thirds from the estate of the children, so as to raise the amount to $1,400, and that the authority of the Court was to be invoked to that end; but the war intervening, their plans were interrupted; that being fearful in the then disturbed state of the country the money would depreciate and become worthless, they were unwilling to receive it, and. they *122 bad loaned the fund to Messrs. McDonald & Kelso, then believed to be perfectly good, taking their note for the amount. That as they could not invest the fund as directed, they had loaned it in order that it might be productive to the parties interested; that said firm of McDonald & Kelso have never paid any of said' note except $50 on account of interest, which was paid to complainant, Martha; that suit had been brought against Henry Kelso, one of the parties, and the note filed with the trustee of K. A. McDonald, who had made an assignment of his property; and that they are hopeful of success in securing the debt.
The complainants excepted to the report:
1. Because it does not show that the trustees used proper diligence in collecting the said j>urchase money from the purchaser of said slave.
2. It does not appear from said report, that they made any effort to invest the same as directed by the Court, after' its collection.
3. That they were not authorized to loan said money.
4. That they did not demand and receive security from McDonald & Kelso, the borrowers of said fond.
The exceptions were sustained, and the parties were ordered • to amend their report, and show what kind of money was paid by the purchaser to McDonald as acting Clerk and Master, and what kind of money they loaned McDonald & Kelso.
At the February Term, 1868, an amended and supplemental report was made, in which it is stated, as a reason for indulging the purchaser of the negro, that they did so at the request of the complainant, Martha, to *123 wbom the purchaser bad agreed to pay ten per cent, interest until an opportunity offered to invest the fund as directed, and at that time he agreed to pay the whole on demand; that they declined to make this agreement for indulgence until they had consulted the solicitor of the complainant, Joel J. Jones, Esq., who advised them to that course until they could reinvest the fund. In the meantime, they made efforts to purchase the woman, but failed; and finally they became distrustful of the intentions of the purchaser, and they took judgment against him, as stated, at August Term, 1860; and, at the instance of the complainant and her solicitor, they permitted the purchaser, after the judgment, to retain the fund until he finally paid it, as stated to McDonald, the then acting Clerk and Master. That being unwilling, themselves, to take charge of the fund for the reason stated, and the said firm of McDonald & Kelso offering to take it and pay interest for it, and they being then considered perfectly good and solvent, the money was loaned to them. The price of negroes, in the meantime, Avas rapidly rising; there were no more sales known to them. That, in February, 1862, they found a woman for sale, and one of them took her to his house with a vieAY to her purchase, but the complainant, Martha, did not like her; that they do not know what kind of funds were paid by the purchaser for the negro, but that, to the best recollection of one of the parties, the payment was in Tennessee and other Southern bank paper.
To this report there Avere tAVO exceptions: 1. Because they had no authority from this Court to loan said *124 money. 2. They took no security for said loan, as the law requires.
The decree of the Court disallows these exceptions, confirms the report, and proceeds to recite that, “it appearing to the Court that the Commissioners could not carry out the decree, after due diligence, in consequence of the high price of negro women, and because it was imprudent to do so, and that they had loaned the money to McDonald & Kelso, without any authority from the Court; but under the facts stated in said report, the Court is satisfied that they acted in good faith, and did what they believed the best for the parties; it is therefore ordered, adjudged and decreed, that said Commissioners are not liable for the said sum of $1,043.35, and orders the bill to be dismissed at the cost of Commissioners; and it is further ordered, that said Commissioners may reimburse themselves for said costs out of any moneys that they may collect of Kelso & McDonald in the suits they are now prosecuting against them on these claims; and that, as it appears to the Court, that they have a judgment against Henry Kelso, and have his land attached, that at the sale of said land, they may bid said debt on the same, or do any other lawful act to collect the money on said judgment.” Prom this decree the complainant, Martha, has appealed to this Court.
We have thought it necessary to refer thus at length to the facts of this case, that the exact relation of these parties to the trust in question may be understood, and that the doctrines of the law which govern the case may be fitly illustrated.
*125 The proposition that confronts us at the threshold, and which is quite too plain and self-evident to demand a reason for its statement, is, that this trust fund would- not have been squandered and lost to the complainant and her children if the trustees had, in assuming the responsibility of lending it, taken good security for its repayment.
The second proposition is, that if the country was in such a state of disturbance and distraction that these parties were unwilling to keep the fund about them, because they apprehended its depreciation, and they deemed it imprudent, even if practicable, to invest the funds as directed by the Court, the instincts of a common prudence would seem to have dictated a wiser course than a loan of the whole fund to a trading firm without security.
A Court of Chancery cannot overlook these salient points, in adjudging the equities of these parties. It is a familiar remark of Lord Hardwicke, that “the doctrines of the law which govern trustees should not be laid down with a strictness to strike terror into mankind acting for the benefit of others, and not for their own; and that as a trust is an office necessary in the concerns between man and man, and which, if faithfully discharged, is attended by no small degree of trouble and anxiety, it is an act of great kindness to accept it.” We have felt the force of this observation in the consideration of this case. As far as the record acquaints us with the motives of these parties, we are not permitted to ascribe to them any but the most honorable intentions.
But yet we have, in this case, the crcissa negligentia *126 of the law books, without the slightest purpose to do a wrong. This Court has repeatedly admonished persons in a fiduciary capacity, of the severe exactions of the law, and the responsibilities of their position. Trustees must not venture to apply the trust money in a manner not authorized by the trust. It would seem a very reasonable and proper investment of one’s own money, to lend it to a person of known wealth and solvency; but a trust fund, raised and created for a specific purpose, must have that direction, if possible, and, if impossible, the aid of a court must be invoked in its disposition. If the trustee give it a different direction, he does it at his peril. In this case, the parties were invested with the trust by the Court; and, in violation of its positive orders, the trust fund has been lost and destroyed. Would it be equitable and just that this woman .and her daughter should lose it? We think not. The circumstances may, perhaps, excuse the trustee for not investing the fund in the manner directed by the Court; but nothing can excuse them for investing in disobedience of the orders of the Court.
In England, the lending of trust moneys, on anything less than the real security, is, even at this late day, seldom sanctioned by a Court of Chancery. In regard to the money of persons under disability, the very fact of lending upon mere personal security was considered a conversion of the fund. “It was never heard of,” said Lord Kenyon, “that a trustee could lend an infant’s money on private security. This is a rule,” said he, “that should be rung in the ears of every person who acts in the character of a trustee; for an act may very. probably be *127 done with the very best intentions, yet no rule in a court of equity is so well established as this.” Chancellor Kent seemed to think the English rule too strict. 4 John. Ch., R., 281, 284. But it is said that it will be at the peril of the trustee, if trust money comes to his hands, such as a debt due from a third person, to suffer it to remain upon the mere personal credit of the debtor, although the testator who created the trust had left it in that very state. 2 Story Eq. Jur., 707.
In the case before us, money was loaned in the midst of uncertain and revolutionary times, in positive disregard of the orders of a court, and without any security whatever, either real or personal. A court of law could' scarcely hesitate to pronounce such a course of conduct a conversion of the fund; and a court of equity, which, Lord Coke says, is but a just correction of the law, will not.
The decree of the Chancellor is reversed, and a decree will be entered here in accordance with the principles announced in this opinion.